**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kevin HUNTER, Defendant–Appellant.**

**No. 01–2838.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 14, 2001.

Decided Dec. 4, 2001.

Before COFFEY, EASTERBROOK and DIANE P. WOOD, Circuit Judges.

## ORDER

Kevin Hunter pleaded guilty to possession with intent to distribute more than five grams of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). The district court sentenced Hunter to the statute's mandatory minimum sentence of 120 months' imprisonment and eight years' supervised release. Hunter appeals, arguing that the trial court erred when finding him ineligible for a "safety valve" exception to the statutory minimum sentence. We affirm.

## Background

In November 2000 police officers executed a search warrant at Hunter's Peoria, Illinois home based on a tip from a confidential informant when Hunter and his girlfriend were present in the house. During the search the police discovered a pill bottle containing 27 rocks of crack weighing 5.6 grams total and 7 pieces of an off-white substance that turned out not to be crack. The police also found crack paraphernalia, $389 in currency in Hunter's pants pocket, and $1,200 in currency in a tupperware container in a downstairs bedroom.

A grand jury indicted Hunter on one count of possession with intent to distribute, and Hunter pleaded guilty thereafter. A probation officer then completed a presentence report. Hunter did not object to the facts contained in the PSR. According to the PSR, Hunter upon questioning admitted to police that the crack was his and told the police that he had purchased the rocks a few days before for $11 each and planned to sell them for $20 each. He also stated that he only sold crack to adults with whom he was acquainted, and that people came to him to buy crack because they knew he "would not mess around with them" and would give them a good deal. The PSR reported that Hunter also said that he was not a "big" dealer and sold crack only to help pay his bills.

The probation officer concluded that Hunter had a total offense level of 23 and no criminal history points thus a guideline imprisonment range of 46 to 57 months. But § 841(b)(1)(B) mandated a minimum sentence of 120 months' imprisonment for Hunter's offense. The greater statutory minimum sentence trumps the guideline range unless the defendant can satisfy the five "safety valve" criteria set forth in 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2:

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or

plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

*See also* U.S.S.G. § 2D1.1(b)(6) (providing for a two-level downward adjustment in offense level for drug defendants who meet "safety valve" eligibility criteria).

The probation officer concluded that Hunter met the first four criteria but was ineligible for the safety valve because, according to the government, he had not met the fifth requirement of complete disclosure and truthfulness. At sentencing Hunter challenged that conclusion, contending that he did fulfill the fifth requirement because he had recently participated in a proffer interview with FBI agents. Hunter did not testify at the sentencing hearing; however, he called FBI special agent Robert Wilson to attempt to establish his eligibility for the safety valve. Wilson testified that during the interview Hunter admitted buying 40 rocks of crack to resell and also that Hunter disclosed that he bought the crack from a man named "Bobby" who hung out at Chugger's, a Peoria bar. Hunter had also given Wilson a general description of Bobby and tried identifying him from pictures of convicted drug dealers.

Through cross-examination the government tried to establish that Hunter had withheld information from Agent Wilson. The government elicited that Hunter had admitted knowing Bobby for many years but still denied knowing his last name, his address, or the kind of car he drove. Wilson also testified that Hunter stated that this was the first time he purchased crack from Bobby and that he had never dealt crack before committing this offense. Wilson said he disbelieved Hunter because he knew from experience that a first-time purchaser would be unable to acquire that much crack in one purchase. Wilson explained that most dealers will not sell a large amount of drugs to someone without first establishing a relationship and building up a trust in that person. Wilson also pointed out that Hunter had said he bought 40 rocks from Bobby, but less than 40 rocks were seized at the time of his arrest. When the agent asked Hunter about this discrepancy during the proffer interview, Hunter told him that he had already sold the other rocks but, despite having previously told police that he only sold crack to adults he knew, could not recall to whom. Wilson added that Hunter would not say whether he sold the missing rocks to one person or to several people. Wilson noted the improbability of Hunter selling the crack out of his home within just a few days of buying it from Bobby if he really was a first-time dealer with no customer base.

At the sentencing hearing new information came to light regarding Hunter's relationship with Bobby. Defense counsel argued that it was not totally surprising that Hunter did not know Bobby's last name, and asserted that Wilson "didn't ask" Hunter how he knew Bobby. The court then asked defense counsel how Hunter knew Bobby. After conferring with Hunter, defense counsel replied that Hunter's brother and his friend Carlos introduced Hunter to Bobby.

The district court concluded that Hunter was ineligible for the safety valve because, the court found, Hunter had not been completely truthful in three respects. First, the court disbelieved that Hunter had known Bobby for many years and failed to know his last name, his address, or the kind of car he drove, and apparently had never tried to learn more about Bobby from his own brother or his brother's friend. Second, the court discredited

Hunter's claim that his purchase of 40 rocks from Bobby was the first time he ever dealt crack. Third, the court found that Hunter was untruthful when he told the agent that he could not recall the individual or individuals to whom he sold the crack he purchased from Bobby. It was incredible, the court reasoned, that the very first time he sold crack, he was able to sell the crack from his house within two days of buying it but did not know the names of any of his customers. Moreover Hunter's statements to police that he sold crack only to adults with whom he was acquainted and that people came to him to buy crack to get a good deal further contradicted his purported lack of drug-dealing experience and knowledge regarding the identity of his customers.

### Analysis

The sole issue is whether the district court erred in concluding that Hunter failed to meet the safety valve's fifth requirement of complete disclosure and truthfulness. The district court "with its fact-finding and credibility-weighing skills, is well suited to make decisions concerning the defendant's full and honest disclosure." *United States v. Ramirez*, 94 F.3d 1095, 1102 (7th Cir.1996). Indeed, "[w]e have frequently held that the trial judge is in the best position to judge the credibility of witnesses who offer conflicting testimony." *United States v. Woods*, 233 F.3d 482, 484 (7th Cir.2000) (quotations and citation omitted). And we do not second-guess the sentencing judge's credibility determinations:

> because he or she has had the best opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns *in contrast with merely looking at the cold pages of an appellate record. United States v. Tolson*, 988 F.2d 1494, 1497 (7th Cir.1993) (quotations omitted).

*Id.* at 484.

We review the sentencing court's factual conclusions under the highly deferential "clear error" standard. *United States v. Gerstein*, 104 F.3d 973, 979–80 (7th Cir. 1997); *United States v. Rodriguez*, 69 F.3d 136, 144 (7th Cir.1995). An appellate court may only reverse a factual finding under this standard when it is left with a "definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). We cannot say that any mistake was committed here.

Hunter argues that the district court clearly erred in finding him untruthful because the government submitted no evidence to contradict his statements or demonstrate that he possessed additional information. But the government need not produce evidence of untruthfulness in order for the court to find him untruthful. Rather, the defendant bears the burden of establishing to the satisfaction of the court his eligibility for the safety valve, including its requirement of complete and honest disclosure. *United States v. Galbraith*, 200 F.3d 1006, 1016 (7th Cir.2000); *Ramirez*, 94 F.3d at 1101. A defendant fails to meet this burden if the government challenges the truthfulness, accuracy, or completeness of his statements, and he then produces nothing to persuade the trial court that his disclosures were truthful and complete. *Ramirez*, 94 F.3d at 1101.

Here the district court was not persuaded that Hunter was truthful and had more than ample reason not to be. At sentencing the government pointed out a number of implausibilities in Hunter's story. The government questioned the credibility of

Hunter's statements that he did not know any more information about Bobby even though he was a long-time acquaintance; that he did not know to whom he sold the crack even though he sold it out of his home; and that he was able to purchase and sell a relatively large amount of crack even though he claimed to be a first-time dealer. The government met its burden, but even so it elicited testimony from Hunter's own witness, Agent Wilson, that bolstered the inference that Hunter had been less than candid with authorities. Wilson explained that typically a first-time dealer could not buy or sell the quantity of crack Hunter possessed, a point the district court reasonably found consistent with its own experience in such cases. As we have noted, "[j]udges in the federal system, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world." *United States v. Hatchett*, 31 F.3d 1411, 1420 (7th Cir.1994). In response defense counsel argued that, despite it being Hunter's first time, he may have been able to purchase that amount based on his prior relationship with Bobby. But counsel's *argument* is not evidence. *See United States v. Harris*, 230 F.3d 1054, 1057 (7th Cir.2000). The defense failed to present any evidence to explain how Hunter knew Bobby; why, given their prior relationship, Hunter purported to know so little about him; or why Hunter could not name anyone to whom he sold the crack.

Moreover, there was other indicia that Hunter was less than truthful when telling authorities about what he knew. Hunter did not tell Wilson how he knew Bobby; that fact was disclosed only at the sentencing hearing. And though Hunter stated to the police unequivocally that he only sold crack to adults with whom he was acquainted, he inexplicably could not name for Wilson any of the individuals to whom he sold the rocks he purchased from Bobby.

In addition, although this offense was supposedly the first time Hunter dealt crack in order to pay his bills, the police found a substantial amount of currency when Hunter and his house were searched. Accordingly, the district court reasonably concluded that Hunter was not completely truthful, and thus was not eligible for the safety valve.

Hunter also contends that because he did not testify on his own behalf at sentencing, the district court had no basis to find him untruthful. Agent Wilson, however, did testify, and the court properly relied upon his testimony regarding Hunter's false statements as well as facts referred to in the PSR that further contradicted Hunter's story. Although it is true that without Hunter's live testimony the district court was unable to assess factors bearing on his credibility, like his demeanor and tone of voice, that does not mean that the court lacked any basis for disbelieving him. As set forth above, the district court had sound reasons to question the credibility of his statements to authorities based on the evidence before it.

AFFIRMED